Harold Becher and Cora Becher v. Commissioner.
Becher v. Commissioner
Docket No. 84739.
United States Tax Court
T.C. Memo 1963-250; 1963 Tax Ct. Memo LEXIS 95; 22 T.C.M. (CCH) 1251; T.C.M. (RIA) 63250; September 13, 1963
*95 Capital v. ordinary loss: Sale or exchange of capital asset: Worthless security: Settlement of action for failure to deliver stock. - The taxpayer paid for shares of stock in a corporation which were never delivered to him. He ultimately settled out of court with the seller for an amount substantially less than he paid. He then claimed a casulty loss due to fraud for the difference. The Court held that the taxpayer had received an interest in the stock and thereby acquired a capital asset. The loss was found to be a capital loss. *96 Morris A. Kaplan, for the petitioners. Robert D. Whoriskey, for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined a deficiency in income tax for 1953 of $3,132.30. Certain adjustments have not been contested. The issues remaining for decision are (1) whether the loss incurred from the settlement of an action for failure of delivery of the stock of a corporation was a capital loss resulting from a sale or exchange of a capital asset; and (2) whether the amount of the loss claimed by petitioner was correct. Some of the facts have been stipulated. Findings of Fact The stipulated facts are hereby found accordingly. Petitioners Harold Becher (hereinafter called petitioner) and his wife Cora, residing at 932 Carroll Street, Brooklyn 25, New York, filed a timely joint Federal income tax return for the calendar year 1953 with the district director of internal revenue, Brooklyn, New York, using the cash receipts and disbursements method of accounting. Petitioner is a professional engineer primarily engaged in designing machinery for his clients. Petitioner desired to expand his activities *97 to include a manufacturing facility. It was his belief that if he could acquire a factory, there would be an economy to his client, a larger fee for himself, and a greater probability of obtaining orders from customers. With this objective in mind, petitioner sought to purchase an ownership interest in Tool & Guage Manufacturing Co., Inc. (hereinafter called Tool). The parties have stipulated that on April 25, 1947, petitioner entered into an agreement with Ralph I. Eagle, Joseph Berman, and Tool in part as follows: WHEREAS, "Eagle" is the owner of 15 shares of the capital stock of [Tool], and WHEREAS, "Berman" is the owner of 5 shares of the capital stock of said [Tool], and WHEREAS, [petitioner] is desirous of purchasing from "Eagle" seven and one-half shares of said aforemention capital common stock owned by "Eagle", and WHEREAS, [Tool] is desirous of having all parties in its employ * * *
1. "Eagle" hereby sells, assigns and transfers in and unto [petitioner] seven and one-half shares of the capital common stock owned by "Eagle" in [Tool] subject to two agreements made by "Eagle" with Murray Hochman and Jack Weinstein, both of said agreements being *98 dated the 3rd day of March, 1947, and by the terms of which "Eagle" deposited with Goldstein & Goldstein, * * * all of the capital common stock owned by "Eagle" in said [Tool] as collateral security for the payment to the said Murray Hochman of the sum of $2500.00 and to secure the payment of $1,000.00 to Jack Weinstein. 2. "Eagle" agrees to pay the said sum of $3500.00 to Hochman and Weinstein when said sums become due and payable so as to give to [petitioner] a full and complete clear title to the aforesaid seven and one-half shares of the capital common stock. 3. "Eagle" and "Berman" warrant and represent that they are the sole stockholders of [Tool] and that there is presently issued twenty shares of the common capital stock of said [Tool] of which "Eagle" owns 15 shares (subject to the aforesaid agreements) and "Berman" 5 shares. 4. [Petitioner] agrees to pay to "Eagle" the sum of $16,500.00 as follows: $13,000 in cash, the receipt whereof "Eagle" hereby acknowledges; the sum of $700.00 in machinery and equipment, the receipt whereof and the value whereof "Eagle" hereby acknowledges, and $2800.00 in cash on or before August 15, 1947. 5. "Berman" hereby appoints *99 [petitioner] * * * as attorney-in-fact to vote two and one-half shares of the stock owned by "Berman" in said [Tool] * * * in any way that he, [petitioner], may see fit * * *. "Berman" does hereby confer this right upon [petitioner], * * * so long as [petitioner] is a stockholder in [Tool]. 6. "Berman" hereby appoints "Eagle" * * * as attorney-in-fact to vote two and one-half shares of the stock owned by "Berman" in said [Tool] * * * in any way that he "Eagle," may see fit * * *. "Berman" does hereby confer this right upon "Eagle," * * * so long as "Eagle" is a stockholder in [Tool]. 7. "Berman" agrees that the certificate of stock for five shares now owned by him shall be endorsed with the legend subject to agreement made the day of , 1947, by and between [petitioner], "Eagle" and "Berman" and "Berman" agrees to deposit said stock with [Tool] to be held by said corporation in escrow for the purpose of effecting the powers of attorney herein granted to [petitioner] and "Eagle", it being the intention of the parties to this agreement that at all times [petitioner] and "Eagle" shall have each the right to vote 50% of the issued and outstanding shares of capital *100 stock of [Tool]. 8. "Berman" shall nevertheless at all time be entitled to receive any and all dividends by reason of his stock ownership as aforesaid, that might be declared by [Tool] it being the intention of the parties hereto that "Berman" gives up to [petitioner] and "Eagle" only his right to vote said stock. 9. In the event of the death of either [petitioner] or "Eagle", the survivor of the two shall purchase * * * the capital stock of the deceased party and shall pay therefor * * * the fair and reasonable value of the deceased party's capital stock. * * * 10. "Eagle" and [Tool] warrant and represent that [Tool] is the owner and holder of 80% of all of the issued and outstanding shares * * * of Peerless Stamping Corp., * * * and that Carl Adler, a brother of "Eagle" is the owner and holder of the remaining 20% * * *. * * *
13. The parties hereto agree that within a reasonable time after "Eagle" pays "Hochman" and "Weinstein" the sums of money owed by him to them, as referred to in paragraph marked "1" hereof, they will execute and cause to be filed with the Secretary of the State of New York an amendment to [Tool's] certificate of incorporation so as *101 to provide for two classes of common stock; Class A of said stock shall have all and full complete voting powers as permitted by law and shall be nondividend paying "Eagle" shall receive fifty percent thereof, and [petitioner] shall receive fifty percent thereof, and Class B of said stock shall be entitled only to dividends, and said stock shall be distributed, forty percent thereof to "Eagle", forty percent thereof to [petitioner] and twenty percent thereof to "Berman." Upon the filing of said certificate of amendment and the delivery of said capital stock as as herein provided for, all powers of attorney herein granted shall immediately cease and terminate and be of no further force and effect. 14. In consideration of the covenants and conditions herein and as a special inducement to [petitioner] to enter into this agreement, "Berman" agrees to assign sell and transfer all of his right, title and interest and unto one share of the common capital stock owned by him in [Tool] to "Eagle" and [petitioner] to the extent of one-half share each. 15. In the event that "Eagle" [defaults] in any of the payments referred to in paragraph marked "1" and "2" herein then and in *102 such event [petitioner] shall have the right to cure any and all of such defaults and thereupon "Eagle" shall become immediately indebted to [petitioner] for any and all sums necessarily expended by [petitioner] to cure said defaults and shall be entitled to receive and retain Eagle's stock until same is repayed. * * *
18. "Eagle" and [petitioner] and "Berman" agree not to sell, assign, hypothicate or pledge any of the capital stock of [Tool] now or hereafter owned by them without first offering said stock for sale to the other stockholder at book value. In computing book value good-will shall not be considered an asset. [Tool] agrees that so long as any of the individual parties hereto remain stockholders of [Tool] it will employ said stockholders at salaries to be fixed and determined by the Board of Directors of [Tool]. * * *
At the time petitioner entered into this agreement, it was his understanding that Eagle was going to acquire the seven and one-half shares from former stockholders of Tool by paying the debt with the money which he received from petitioner. Petitioner was not represented by counsel in connection with the agreement which was drawn *103 by Eagle's attorney. Petitioner paid the $16,500 in full and sought to have Eagle deliver the seven and one-half shares of stock. Eagle never delivered the stock to petitioner. On April 17, 1953, petitioner instituted an action in the Supreme Court of the State of New York, County of New York, against Eagle, Tool, and Tool & Metal Specialty Co., Inc., defendants, for the delivery of the seven and one-half shares of the common stock of Tool or equivalent damages. On June 30, 1953, petitioner and Eagle entered into an agreement in settlement of the above action, providing in part as follows: * * *
WHEREAS, in the month of April, 1947, [petitioner] and Eagle entered into an agreement in writing by the terms of which [petitioner] agreed to buy from Eagle and Eagle agreed to sell to [petitioner] seven and one-half (7 1/2) shares of the capital common stock owned by Eagle in [Tool], and WHEREAS, by the terms of said aforementioned agreement, [petitioner] was to pay Eagle the sum of $16,500.00 over a period of time, and WHEREAS, by the terms of said aforementioned agreement Eagle was to deliver said stock to [petitioner] upon payment of said sum of $16,500.00, *104 and WHEREAS, [petitioner] has, from time to time, made demands upon Eagle for the delivery of said stock, and WHEREAS, Eagle has never delivered said stock to [petitioner], and WHEREAS, Eagle has refused to deliver said stock to [petitioner] and is, as of the date of these presents, no longer in a position to deliver the same, and WHEREAS, the parties are desirous of settling their differences, and WHEREAS, [petitioner] has commenced an action in the Supreme Court of the State of New York, County of New York for the delivery of said stock or equivalent damages. NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties do hereby agree as follows: 1. Eagle agrees to pay to [petitioner] and [petitioner] agrees to accept the sum of $2500.00 in full satisfaction of any and all claims which [petitioner] may have against Eagle. Said sum of $2500.00 to be paid as follows: (a) The sum of $500.00 simultaneously with the execution of this agreement, by check of Tool & Metal Specialty Mfg. Co., Inc., the receipt whereof is hereby acknowledged. (b) The sum of $500.00 per month for a period of four (4) months * * * as evidenced by four *105 promissory notes of Tool & Metal Specialty Mfg. Co., Inc. * * *
2. [Petitioner] assigns, sets over and transfers unto Eagle all of his right, title and interest in and unto any claims which he may have against [Tool] * * * and all of his right, title and interest in and to any of the capital stock of [Tool] * * *. 3. [Petitioner] warrants and represents that he has not heretofore assigned his claims against [Tool] * * * nor has he assigned any of his rights to the capital stock of [Tool] * * *. 4. Eagle agrees that, simultaneously with the execution of this agreement, to obtain from Carl Adler a general release in the usual form running in favor of [petitioner] and [petitioner] agrees simultaneously therewith to execute a general release in the usual form to Carl Adler. 5. The parties agree that as, if and when Eagle pays the said aforementioned sum of $2500.00 to [petitioner], as herein provided for, then and in such event, the parties hereto shall be deemed to have released each other of any and all claims and this agreement shall constitute general releases, by the parties of each other. 6. Eagle agrees simultaneously with the execution of this agreement *106 to procure from [Tool] and Peerless Stamping Corp., general releases in the usual form in favor of [petitioner] and [petitioner] agrees simultaneously therewith to execute general releases in the usual form to [Tool] and Peerless Stamping Corp. 7. The parties agree that, simultaneously with the execution of this agreement, they or their respective attorneys will enter into a stipulation discontinuing the action now pending by [petitioner] in the Supreme Court of the State of New York, without costs as against any of the parties to such action. Petitioner left the employ of Tool towards the middle of 1948. Petitioner never received stock certificates or written evidence of stock ownership in Tool, and never exercised any privilege of a stockholder or gained access to the books and records of Tool. Petitioner entered into the settlement agreement for $2,500 because Eagle claimed he could not pay more and petitioner thought that the attempt to procure additional amounts would have required additional litigation and costs. Eagle originally offered less than $2,500. It was not petitioner's understanding that this amount was a price for the sale of stock. Petitioner claimed *107 a loss of $14,000 on his income tax return for 1953 under the classification: "Losses from fire, storm, or other casualty, or theft." with the following notation: "Casualty loss by fraud suit on R I Eagle for nondelivery of stock purchased for $16,500.00. Eagle settled out of court for $2500. Loss $14,000.00" Respondent's deficiency notice disallowed the deduction as an ordinary loss with the following explanation: (a) In your return for 1953 you claimed a deduction for a casualty loss in the amount of $14,000.00. It is determined that this loss, arising from a stock transaction entered into by you, constitutes a capital loss, rather than an ordinary loss. Respondent allowed a $1,000 capital loss for the calendar year 1953. Opinion Respondent's deficiency notice concedes that the loss for which petitioner seeks a deduction occurred in 1953. The disagreement is limited [1] to whether the loss from the transaction in question constituted an ordinary or a capital loss. [2]
*108 Petitioner's initial position is that since he never acquired actual title to the stock in Tool for which he paid $16,500, he could not have sold or exchanged such stock. But, despite the statutory provision of section 162 of the New York Personal Property Law requiring delivery for the transfer of title to a stock certificate, the sales contract here "effected a transfer of the equitable if not legal title" to the interest in Tool. Parsons v. Lipe, 158 Misc. 32, 286 N. Y. Supp. 60, at p. 90 (Sup. Ct., Spec. Term, 1933), affirmed sub nom. Parsons v. First Trust & Deposit Co., 243 App. Div. 681, 277 N. Y. Supp. 426 (Sup. Ct., App. Div., 1935), affirmed per curiam 269 N. Y. 630, 200 N.E. 31 (1936). Petitioner became the beneficial owner of an interest in Tool upon the execution of this contract, I. C. Bradbury, 23 B.T.C. 1352 (1931), affirmed sub nom. Commissioner v. Timmer, 78 F. 2d 599 (C.A. 6, 1935); W. F. Marsh, 12 T.C. 1083 (1949), and was able to sell or assign this interest in the corporation in such a transaction as could constitute a sale. Quincy A. Shaw McKean, 6 T.C. 757 (1946). His possession *109 of, or ability to transfer, certificates of stock was not critical. I. C. Bradbury, supra at p. 1361; Richardson v. Shaw, 209 U.S. 365 (1908). Even though this was a capital asset, there is still the question, as framed by the parties, whether this was a "sale or exchange." If it was, even though the sale was a transfer back to the original vendor, the result would be a capital transaction, Quincy A. Shaw McKean, supra; Margery K. Megargel, 3 T.C. 238 (1944), and under section 117 the loss would be a capital loss. Petitioner's only rejoinder to this contention is that the agreement settling the litigation was the result of his inability to secure either the stock or his original purchase price because of lack of capacity to perform on the part of the original vendor. As we have already seen, petitioner received an interest in the Tool stock, and thereby acquired a "capital asset." [3] After settlement of the litigation it no longer belonged to petitioner. If it was not sold, it is implicit in petitioner's position that this interest had become virtually worthless by the time the settlement with his vendor was made. Petitioner's loss was slightly *110 mitigated by his recovery of a fraction of his investment from the person to whom he had paid it. As a result of respondent's concession in his deficiency notice, we may assume in petitioner's favor that the fact of worthlessness was not ascertained with certainty until the year before us. See Arthur Webster, 6 T.C. 1183 (1946). When it was, and the transaction was completed, petitioner no longer had either stock nor the right thereto, nor the possibility of any additional reimbursement of his outlay.
*111 The difference between the $16,500 which he paid and the $2,500 he received from the original vendor was petitioner's loss which arose because of his original payment under the sales contract. The purpose of the contract is clear, and none of the parties treat it otherwise than as giving petitioner the "right * * * to receive" "shares of stock in a corporation," [4] which, under the plain language [5] of section 23(g)(3), makes it a "[security]." When petitioner succeeded in recovering only a small fraction of his investment, it follows that the upshot was a "loss," Arthur Webster, supra, from the worthlessness of this "[security]." It seems clear that whatever loss there was resulted from the degree of its worthlessness, which, to that extent, is the justification for any loss deduction. But this is precisely the subject matter of section 23.
*112 Under the circumstances, if petitioner's loss did not arise from a sale or exchange, it was due to the worthlessness of the right that he had initially acquired to receive the stock. In neither event was it an ordinary deduction but only a capital loss. To take account of uncontested adjustments, Decision will be entered under Rule 50. Footnotes
1. Our finding that petitioner paid the full contract price of $16,500 disposes of respondent's minor contention that only $16,000 was paid. ↩
2. SEC. 23 [I.R.C. 1939]. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(g) Capital losses. - (1) Limitation. - Losses from sales or exchanges of capital assets shall be allowed only to the extent provided in section 117. * * *↩
3. SEC. 117. [I.R.C. 1939]. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - (1) Capital assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; (B) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 23(1), or real property used in his trade or business; (C) a copyright; a literary, musical, or artistic composition; or similar property; held by - (i) a taxpayer whose personal efforts created such property, or (ii) a taxpayer in whose hands the basis of such property is determined, for the purpose of determining gain from a sale or exchange, in whole or in part by reference to the basis of such property in the hands of the person whose personal efforts created such property; or (D) an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue. * * *↩
4. "WHEREAS, [petitioner] has commenced an action in the Supreme Court of the State of New York, County of New York for the delivery of said stock or equivalent damages." Agreement settling the litigation brought by petitioner against the vendor. ↩
5. SEC. 23 [I.R.C. 1939]. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(g) Capital losses. - * * *
(2) Securities becoming worthless. - If any securities (as defined in paragraph (3) of this subsection) become worthless during the taxable year and are capital assets, the loss resulting therefrom shall, for the purposes of this chapter, be considered as a loss from the sale or exchange, on the last day of such taxable year, of capital assets. (3) Definition of securities. - As used in this subsection, the term "securities" means (A) shares of stock in a corporation, and (B) rights to subscribe for or to receive such shares.↩